IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

SOUTHEAST STORMWATER
ASSOCIATION, INC.; FLORIDA
STORMWATER ASSOCIATION, INC.;
FLORIDA RURAL WATER
ASSOCIATION, INC.; and FLORIDA
LEAGUE OF CITIES, INC.

Case No. _____

     Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; GINA
MCCARTHY, in her official capacity as
Administrator of the United States
Environmental Protection Agency;
UNITED STATES ARMY CORPS OF
ENGINEERS; ERIC FANNING, in his
official capacity  as Secretary of the Army;
and JO-ELLEN DARCY, in her official
capacity as Assistant Secretary of the Army
for Civil Works.

     Defendants.

**EXPEDITED COMPLAINT FOR
<u>DECLARATORY AND INJUNCTIVE RELIEF</u>**

The Southeast Stormwater Association, Florida Stormwater Association,

Florida Rural Water Association, and Florida League of Cities (collectively

"Plaintiffs") file this Complaint against the U.S. Environmental Protection Agency

and its Administrator (collectively "EPA"), and the U.S. Army Corps of Engineers

and its civilian leadership (collectively "Corps"). Plaintiffs challenge a final administrative rule promulgated by EPA and Corps titled "Clean Water Rule: Definition of 'Waters of the United States'" (the "Rule"). 80 Fed. Reg. 37,054 (Jun. 29, 2015). The Rule seeks to define the federal government's jurisdiction under the Clean Water Act, the basis from which the Act's regulatory requirements flow. But the Rule far exceeds the federal government's powers under the Commerce Clause, fails to afford protections guaranteed by the Due Process Clause, contravenes the Clean Water Act's text, misinterprets U.S. Supreme Court precedent, subverts applicable notice-and-comment requirements, masks its true fiscal impact through a flawed economic analysis, and is otherwise arbitrary and capricious. If implemented, the Rule would adversely affect and indeed impede the stormwater management functions served by members of the Plaintiff organizations. Among other things, the Rule would divert and dilute scarce local government resources. This, in turn, would make meaningful water quality improvements more difficult to attain and then sustain. Plaintiffs thus ask the Court to vacate the Rule. Plaintiffs state in support:

INTRODUCTION

1.     The Clean Water Act prohibits "the discharge of any pollutant by any person" without a National Pollution Discharge Elimination System ("NPDES") permit issued in accordance with § 402 of the Act, or a dredge and fill permit

issued in accordance with § 404 of the Act.  33 U.S.C. § 1311(a).  The Act defines "discharge of a pollutant" as the "addition of any pollutant to navigable waters from any point source."  *Id.* § 1362(12)(A).  "Navigable waters" are defined as "the waters of the United States, including the territorial seas."  *Id.* § 1362(7).

2.      The Rule is an attempt to "clarify the scope of 'waters of the United States' that are protected under the Clean Water Act."  80 Fed. Reg. at 37,055.  Stated differently, the Rule delineates the scope of federal jurisdiction under the Clean Water Act by identifying the waters and features that fall within the Act's definition of "navigable waters."  *Id.*

3.      The Rule results in an expansion of federal jurisdiction under the Clean Water Act, making it necessary for members of the Plaintiff organizations to obtain additional – and unnecessary – permits under § 402 or § 404 of the Act.

4.      This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-706.  In promulgating the Rule, EPA and the Corps took actions that were "arbitrary, capricious, an abuse of discretion," and "otherwise not in accordance with law," *id.* § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); and "without observance of procedure required by law," *id.* § 706(2)(D).

5.     Plaintiffs seek a declaration from the Court that EPA and the Corps relied on a flawed process when promulgating the Rule:  the agencies failed to provide adequate notice-and-comment on the scientific reports that underpin the final Rule, made significant revisions to the final Rule without reopening the notice-and-comment process, conducted an inadequate and fatally-flawed economic analysis, and engaged in an advocacy process that tainted their role as unbiased regulators charged with considering – not shaping – public comments.

6.     Plaintiffs seek a declaration from the Court that the Rule itself is substantively flawed:  the Rule exceeds the federal government's authority under the Commerce Clause, includes provisions so vague as to violate the Due Process Clause, contravenes provisions of the Clean Water Act, misinterprets U.S. Supreme Court precedent, and is otherwise inconsistent with sound science and prudent public policy.

7.     Plaintiffs further seek an order vacating the Rule and enjoining its application.

JURISDICTION AND VENUE

8.     The Court has federal question jurisdiction under 28 U.S.C. § 1331. The Court has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 705 and 706(1)-(2).

9.    EPA and the Corps have argued in other forums that exclusive subject matter jurisdiction lies in the federal circuit courts of appeal under § 509(b) of the Clean Water Act.  33 U.S.C. § 1369(b)(1).  Not so.  Section 509(b) confers original jurisdiction on the circuit courts for only seven types of final agency actions:  (1) promulgation of "any standard of performance" under 33 U.S.C. § 1316 for various sources of water pollution; (2) "determination[s]" of categories of sources of water pollution under 33 U.S.C. § 1316(b)(1)(C); (3) promulgation of effluent standards and prohibitions under 33 U.S.C. § 1317; (4) "determination[s] as to a State permit program" submitted under 33 U.S.C. § 1342(b); (5) approval or promulgation of effluent limitations under 33 U.S.C. §§ 1311, 1312, 1316, or 1345; (6) issuance or denial of a permit under the NPDES program; and (7) promulgation of an "individual control strategy" under 33 U.S.C. § 1314(*l*).  If a final agency does not fall within one of these seven categories, the federal district courts have jurisdiction.  *See, e.g., Friends of the Everglades v. EPA,* 699 F.3d 1280, 1286-89 (11th Cir. 2012) (rejecting original jurisdiction under § 509(b) of the Clean Water Act).

10.    The Rule promulgated by EPA and the Corps is not one of the seven types of final agency actions specifically enumerated in § 509(b)(1) of the Clean Water Act.  The Rule is not a standard of performance, a determination of source categories, an effluent standard or prohibition, a determination as to a state

permitting program, an approval of an effluent limitation, an issuance or denial of a permit, or an individual control strategy.  Instead, the Rule defines the scope of federal jurisdiction under the Clean Water Act.  As such, this Court has original jurisdiction to review the Rule.

11.    In an abundance of caution, however, Plaintiffs have filed a petition for review under § 509(b) with the U.S. Court of Appeals for the Sixth Circuit within the 120 days prescribed by the Clean Water Act.  *See* 33 U.S.C. § 1369(b)(1).  While Plaintiffs believe that this Court has jurisdiction to review the Rule, Plaintiffs are mindful of the Seventh Circuit's admonition in *Am. Paper Inst. v. EPA,* 882 F.2d 287, 288 (7th Cir. 1989) that "[c]areful lawyers must apply for judicial review [in the circuit courts] of anything remotely resembling" an action reviewable under § 509(b)(1) of the Act.

12.    Venue is proper under 28 U.S.C. § 1391(d) because one or more Plaintiffs (and their members) reside in the district.  Venue is also proper under 28 U.S.C. § 1391(e)(1)(C) because the Defendants are agencies and officers of the United States.

PARTIES

13.    Plaintiff Southeast Stormwater Association ("SESWA") is a not-for-profit corporation actively involved in the development of water quality regulations and implementation of water quality improvement programs in the

6

southeast.  SESWA has over 150 organizational members, consisting primarily of municipal and county governments in Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, and Tennessee.  SESWA members also include water control districts and authorities, academic institutions, and consulting and engineering firms throughout the southeast.  Many SESWA members must obtain and then comply with NPDES permits for municipal separate storm sewer systems ("MS4s").  All SESWA members have an interest in the effective management of stormwater.

14.    Plaintiff Florida Stormwater Association ("FSA") is a not-for-profit corporation actively involved in the development of water quality regulations, and implementation and financing of water quality improvement programs throughout Florida.  FSA has over 300 organizational members, consisting primarily of municipal and county governments in Florida.  FSA members also include water control districts, academic institutions, and consulting and engineering firms throughout Florida.  Many FSA members must obtain and then comply with NPDES permits for MS4s.  All FSA members have an interest in the effective finance and management of stormwater and stormwater systems.

15.    Plaintiff Florida Rural Water Association ("FRWA") is a not-for-profit corporation originally created to assist smaller communities with their water-related operations and regulatory obligations.  FRWA's 1,817 water utility

members include counties, municipalities and special purpose districts throughout Florida.  Many FRWA members must obtain NPDES permits, including permits for their MS4s.

16.    Plaintiff Florida League of Cities ("League") is a not-for-profit corporation that represents the interests of 409 cities and one charter county in Florida.  The League is one of the largest municipal organizations of its kind in the country.  One of the League's purposes is to represent its members before the judicial branch of government on issues pertaining to the welfare of its members.  Many League members must obtain NPDES permits for their municipal wastewater utilities, electric utilities, and MS4s.

17.    Defendant U.S. Environmental Protection Agency has the primary responsibility to implement the Clean Water Act.  EPA promulgated the Rule at issue together with the Corps.

18.    Defendant U.S. Army Corps of Engineers shares with EPA the responsibility to implement the Clean Water Act.  The Corps promulgated the Rule at issue together with EPA.

19.    Defendant Gina McCarthy is Administrator of EPA.  In her official capacity, on May 27, 2015, Administrator McCarthy signed the Rule at issue.

20.    Defendant Eric Fanning is Secretary of the Army.  In his official capacity, Secretary Fanning provides civilian oversight over the Corps.

21.    Defendant Jo-Ellen Darcy is Assistant Secretary of the Army for Civil Works.   In her official capacity, on May 27, 2015, Assistant Secretary Darcy signed the Rule at issue.

STANDING

22.    Members of the Plaintiff organizations cannot discharge into "waters of the United States" without the necessary Clean Water Act permits.   But the Rule's use of certain terms – such as "tributary," "adjacent waters," "significant nexus," and "dry land" – and case-specific determinations create uncertainty about which waters and features are "waters of the United States."   This jurisdictional uncertainty deprives members of the Plaintiff organizations of notice of what the law is and what it requires of them.   A failure to comply would have serious consequences for members of the Plaintiff organizations.

23.    Negligently discharging into "waters of the United States" without the necessary permit may be considered a criminal offense with first-time criminal penalties of up to $25,000 per violation per day and up to one year in prison per violation.   33 U.S.C. § 1319(c)(1).   Knowingly discharging into "waters of the United States" without the necessary permit may be considered a criminal offense with first-time criminal penalties of up to $50,000 per violation per day and up to three years in prison per violation.  *Id.* § 1319(c)(2).

24.     Civil penalties of up to $37,500 per violation per day may be imposed for unauthorized discharges into "waters of the United States." *See id.* § 1319(d).

25.     The Clean Water Act also authorizes citizen suits by any "person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g).   Regardless of the outcome, the regulated community must incur substantial costs in defending citizen suits.

26.     As such, members of the Plaintiff organizations must incur significant costs to simply ensure that their activities do not result in unauthorized discharges into waters or features that constitute "waters of the United States."   Costs of complying with the Clean Water Act's regulatory requirements inevitably follow.

27.     For example, Pinellas County, Florida, and its co-permittees expect to spend billions of dollars because of the Rule.[1]   Pinellas County is the lead permittee for MS4 Permit FLS000005, and is a FSA member.   The following, many of which are League, FSA and FRWA members, are Pinellas County's co-permittees:   City of Belleair Beach, City of Belleair Bluffs, City of Clearwater, City of Dunedin, City of Gulfport, City of Indian Rocks Beach, City of Largo, City of Madeira Beach, City of Oldsmar, City of Pinellas Park, City of Safety Harbor, City of Seminole, City of South Pasadena, City of St. Pete Beach, City of Tarpon

---

[1] Pinellas County's comments appear on the rulemaking docket at EPA-HQ-OW-2011-0880-14426.

Springs, City of Treasure Island, FDOT District 7, Town of Belleair, Town of Kenneth City, Town of North Redington Beach, Town of Redington Beach, and Town of Redington Shores.  It is estimated that Pinellas County and its co-permittees must spend between $131 million to $1.03 billion to comply with standards for Total Nitrogen in waters that the Rule would make jurisdictional, and between $299 million to $1.69 billion to comply with standards for Total Phosphorus in newly jurisdictional waters.  *See* ATM Attachment to FSA Comments at 9.

28.    More specifically, "[Pinellas] County [itself] owns and operates 149 wet detention pond facilities, each of which discharges into the [County's] MS4." Pinellas Comments at 4.  Application of federally enforceable water quality standards to these wet detention ponds "could cost the County . . . [an] additional $85 million."  *Id.*  "This estimate does not include complying with water quality standards in ditches or other similar stormwater conveyances."  *Id.*  To simply "compile permit applications or exemptions" for 1,318,867 linear feet of ditches in the County's MS4 system would cost $21,101,872 at a historic cost that ranges between $16-$23 per linear foot.  *Id.* at 5.  The cost to "compile permit applications or exemptions" for 3,563,411 linear feet of pipes within the MS4 would be $57,014,576.  *Id.* at 6.  The "cost to compile permit applications or

exemptions" for the MS4's 849,946 linear feet of "major drainage channels" would be $13,599,136. *Id.*

29.    Mecklenburg County, North Carolina, a SESWA member, similarly fears that the Rule would impede the use of Best Management Practices ("BMPs") intended to benefit the environment.[2]  Mecklenburg County "is located in the piedmont region of North Carolina," Mecklenburg Comments at 1, and worries that BMPs often "constructed in wet ponds and wetlands," but designed to benefit waters further downstream, could themselves become "waters of the United States." *Id.* at 2.  This would make it more difficult to implement BMPs and divert resources needed to improve the environment. *See id.*

30.    Gwinnett County, Georgia, another SESWA member, shares these fears, noting that "it is not clear to [Gwinnett County] the extent to which water within the County's stormwater system, which is intended to retain, detain and convey stormwater for treatment, may be treated as a 'water of the United States.'" Gwinnett County at 2.[3]

---

[2] Mecklenburg County's comments appear on the rulemaking docket at EPA-HQ-OW-2011-0880-10946.

[3] Gwinnett County's comments appear on the rulemaking docket at EPA-HQ-OW-2011-0880-17352.

31.    The Village of Wellington, Florida, a city of less than 60,000 people, and a FSA and League member, estimates that it would cost $9 million just to bring its canal system, which is a part of its MS4, into compliance with existing water quality standards. *See* Attachment to FSA Comments at 7.[4]

32.    Volusia, County, Florida, a FSA and FRWA member, estimates that it must spend $30,368,000 to meet water quality standards in a canal that simply conveys water into a more ecologically significant water, diverting resources necessary to attain and maintain water quality in the latter. *Id.* at 17-18.

33.    To comply with the Rule, the City of Miramar, Florida, a city of less than 130,000 people and a League member, estimates that it must impose "a 900% increase in an assessment fee for stormwater management." Miramar Comments at 3.[5]

34.    Comments by the Plaintiffs and their members provide many more examples of the harm that Rule would cause. *E.g.,* Attachment to FSA Comments at 1-18 (providing examples of ditches, canals, ponds, and other stormwater conveyances affected by the Rule); *see also* D. Sunding & D. Zilberman, *The*

---

[4] FSA's comments appear on the rulemaking docket at EPA-HQ-OW-2011-0880-14613.

[5] The City of Miramar's comments appear on the rulemaking docket at EPA-HQ-OW-2011-0880-14466.

*Economics of Environmental Regulation by Licensing:  An Assessment of Recent Changes to the Wetland Permitting Process,* 42 Nat. Resources J. 59, 74-76 (2002) (noting, for example, that an "individual permit application" for a dredge and fill permit costs on average "over $271,596 to prepare" and that it takes "an average of 788 days (or two years, two months)" to obtain an individual permit).

35.     In short, the Rule's expansion of federal jurisdiction would divert and dilute scarce local government resources.  This would be to the detriment of the Plaintiffs, their members, and the environment.  *See* FSA Comments at 5, 9; JEA Comments at 2-3 (noting that Rule would "misallocate limited public resources" being used by City of Jacksonville, a League, FSA, and FRWA member);[6] Florida Department of Agriculture and Consumer Services Comments at 4-6 (noting that Rule would "divert resources away from ongoing state and federal priority restoration efforts and towards unnecessary efforts to protect waters that do not directly affect human health and aquatic life" such as stormwater conveyances).[7]

36.     Failure to provide adequate notice-and-comment prior to finalizing the Rule further harms the Plaintiffs and their members.  *See, e.g., JEM Broad. Co. v.*

_____

[6] JEA's comments appear on the rulemaking docket at EPA-HQ-OW-2011-0880-15194.

[7] The Department's comments appear on the rulemaking docket at EPA-HQ-OW-2011-0880-10260.

*FCC,* 22 F.3d 320, 326 (D.C. Cir. 1994) ("when a party complains of an agency's failure to provide notice and comment prior to acting, it is that failure which causes 'injury'; and interested parties are 'aggrieved' by the order promulgating the rules").

37.    Vacatur of the Rule would remedy harm to the Plaintiffs and their members by, among other things, relieving the regulatory and economic burdens that come with the Rule's expansion of federal jurisdiction under the Clean Water Act.

38.    A primary purpose of each Plaintiff organization is to represent and protect the interests of its members on matters like the federal rulemaking at issue here. *See e.g.,* FRWA Comments at 1-4;[8] League Comments 1-5.[9]

39.    Each Plaintiff organization has members who have standing to sue in their own right because these members are specifically and pervasively regulated under the Clean Water Act; however, neither the claims asserted nor relief requested require any individual member of the Plaintiff organizations to participate in this lawsuit.

---

[8] FRWA's comments appear on the rulemaking docket at EPA-HQ-OW-2011-0880-14897.

[9] The League's comments appear on the rulemaking docket at EPA-HQ-OW-2011-0880-14466.

40.     Each Plaintiff organization also has standing to sue in its own right. Each Plaintiff organization invests resources in activities intended to assist members with Clean Water Act compliance.  The Rule's expansion of federal jurisdiction under the Act would impair those activities by stretching the resources of the Plaintiff organizations.  As such, the Plaintiff organizations have standing to sue in their own right.  *See, e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired [organization]'s ability to provide [services], there can be no question that the organization has suffered injury in fact.  Such concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests.").

THE RULE

*Response to Three U.S. Supreme Court Opinions*

41.     The Rule is a response to three U.S. Supreme Court decisions interpreting the phrase "waters of the United States":  *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121 (1985), *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,* 531 U.S. 159 (2001) ("*SWANCC*"), and *Rapanos v. United States,* 547 U.S. 715 (2006).

16

42.    The *Riverside Bayview* case concerned a wetland "adjacent to a body of navigable water" in an "area characterized by saturated soil conditions and wetland vegetation [that] extended beyond the boundary of respondent's property" to "a navigable waterway."  474 U.S. at 131.  There, the Court upheld the federal government's interpretation of "waters of the United States" to include a wetland that "actually abuts on a navigable waterway."  *Id.* at 135.

43.    Following *Riverside Bayview,* the federal government "adopted increasingly broad interpretations of its own regulations under the Act."  *Rapanos,* 547 U.S. at 725.

44.    The *SWANCC* case contracted a margin of this expanding federal universe:  the Migratory Bird Rule.  The Migratory Bird Rule extended federal jurisdiction to any *intra*state waters "[w]hich are or would be used as habitat" by migratory birds.  51 Fed. Reg. 41,206, 41,217 (Nov. 13, 1986).  At issue in *SWANCC* was whether the Migratory Bird Rule applied to "an abandoned sand and gravel pit in northern Illinois."  *SWANCC,* 531 U.S. at 163-64.  Explaining that "[i]t was the significant nexus between the wetlands and 'navigable waters' that informed [the Court's] reading of the [Clean Water Act] in *Riverside Bayview*," the U.S. Supreme Court held that "nonnavigable, isolated, intrastate waters," which did not "actually abu[t] on a navigable waterway," are not "waters of the United States."  *Id.* at 167, 171.

17

45.     *Rapanos* further clipped the boundaries of federal jurisdiction.   In *Rapanos*, the U.S. Supreme Court "consider[ed] whether four Michigan wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters, constitute 'waters of the United States' within the meaning of the Act." *Rapanos,* 547 U.S. at 729.   Prior to *Rapanos*, the federal government had "interpreted its own regulations to include 'ephemeral streams' and 'drainage ditches' as 'tributaries' that are part of the 'waters of the United States.'" *Id.* at 725.   "This interpretation extended 'the waters of the United States' to virtually any land feature over which rainwater or drainage passes and leaves a visible mark." *Id.*   A five-member majority of the U.S. Supreme Court rejected this interpretation.   A four-member plurality of the Court held that "waters of the United States" do not "include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id.* at 739.   Justice Kennedy concurred in the judgment; however, for wetlands, Justice Kennedy would require a "significant nexus" between wetlands and jurisdictional waters – a showing that the wetlands "significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780.

46.     In response to *Riverside Bayview, SWANCC,* and *Rapanos*, EPA and the Corps jointly promulgated the Rule. *See, e.g.,* 80 Fed. Reg. at 37,056-57.

*Process of Promulgating the Rule*

47.     EPA and the Corps published the proposed Rule on April 21, 2014, and took comments on the proposal until November 14, 2014.

48.     Months later, on January 15, 2015, EPA released its final Connectivity Report.  That report "provides much of the technical basis for this [R]ule."  80 Fed. Reg. at 37,057.

49.     Plaintiffs and their members had no meaningful opportunity to comment on the Connectivity Report.  EPA's Science Advisory Board ("SAB") was considering the Connectivity Report throughout the Rule's comment period. Many thus asked EPA and the Corps to extend the comment period.  Plaintiff FSA, for example, requested "an additional 90-day comment period . . . beginning after the [SAB] release[d] its final report summarizing its analysis of the connectivity report."  FSA Sept. 30, 2014 Comments at 1.[10]  EPA and the Corps refused.

50.     The SAB submitted the Connectivity Report to EPA, with recommendations for revisions to the Rule.  Based on those recommendations, significant changes were made to the Rule without providing Plaintiffs and their members an opportunity to comment on "the technical basis for this [R]ule."  80 Fed. Reg. at 37,057.  As such, the rulemaking had outpaced its own technical basis.

_____

[10] FSA's request for extension of time appears on the rulemaking docket at EPA-HQ-OW-2011-0880-7965.

51.    EPA and the Corps also failed to consider public comments with an open mind.  EPA and the Corps used federal funds to campaign for the proposed Rule and respond to criticisms of the proposal.  More specifically, EPA and the Corps used federal funds to prepare news releases, webcasts, blog posts, and social media to *shape* public comments rather than simply *consider* public comments – to influence members of Congress, state and local government officials, and the general public.  *Compare* http://perma.cc/F9U3-NW36 (urging people to submit comments such as "[c]lean water is important to me" and that "I support EPA's efforts to protect it for my health, my family, and my community") *with* Anti-Lobbying Act, 18 U.S.C. § 1913 (prohibiting use of public funds to "directly or indirectly . . . influence in any manner" members of Congress, or "an official of any government").

52.    Contrary to the requirements of the Regulatory Flexibility Act, 5 U.S.C. §§ 601-12, EPA and the Corps failed to (1) solicit flexible regulatory alternatives, (2) consider these alternative proposals, and (3) provide a meaningful economic analysis.  EPA and the Corps instead concluded that the Rule would not have significant economic impacts on small entities, including smaller government entities.  *See* 80 Fed Reg. at 37,102.  Comments filed by the Small Business Administration's Office of Advocacy contradict this conclusion.  The Small Business Administration notes in its comments to EPA and the Corps:

> Advocacy and small businesses are extremely concerned about the rule as proposed.  The rule will have a *direct and potentially costly* impact on small businesses.   The limited economic analysis which the agencies submitted with the rule provides ample evidence of a potentially significant economic impact.  Advocacy advises the agencies to *withdraw the rule* and conduct a SBAR [or Small Business Advocacy Review] panel prior to promulgating any further rule on this issue.

Small Business Admin. Comments at 9 (emphasis added).

53.    Also, as noted above, members of the Plaintiff organizations fear that they must spend billions of dollars should their stormwater conveyances suddenly become "waters of the United States."  MS4s in Manatee County, Florida plan to spend as much as $2.3 billion; in Pinellas County, Florida as much as $1.69 billion; in Sarasota County, Florida as much as $476 million; and in Seminole County, Florida as much as $1.95 billion.  *See* ATM Attachment to FSA Comments at 1-14. This contradicts statements in EPA's economic analysis of the Rule.  There, the federal government wrongly assumes that there are no costs associated with waters becoming subject to water quality standards, monitoring requirements, total maximum daily load ("TMDL") development, and TMDL implementation.  *See* EPA Economic Analysis at 15-16.

54.    The Rule's economic analysis is replete with other such errors that underestimate some costs and completely ignore others.  The economic analysis, for example, underestimates the costs of mitigation associated with areas becoming

jurisdictional, and ignores the costs of seeking exemptions and defending additional enforcement actions or citizen suits.

*Substance of the Final Rule*

55.    The final Rule itself expands federal jurisdiction in a vague and uncertain manner.  The Rule places waters into three broad categories:  (1) waters that are always jurisdictional, (2) waters "that require a case-specific significant nexus evaluation" to determine whether they are jurisdictional, and (3) waters excluded from jurisdiction.

56.    *Always Jurisdictional* – Six types of waters are always jurisdictional: (1) "traditional navigable waters," (2) interstate waters, (3) territorial seas, (4) impoundments of waters deemed jurisdictional, (5) tributaries, and (6) waters "adjacent" to the other five types.

a.    "Traditional navigable waters" are "waters that are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide." 80 Fed. Reg. at 37,074.

b.    "Interstate waters" are waters that cross state borders, "even if they are not navigable" and "do not connect to [navigable] waters."  *Id.*

c.    "Territorial seas" are "the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with

22

the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles." *Id.* at 37,075 (quoting from § 502(8) of the Clean Water Act).

d. Tributary is any water that (1) "contributes flow either directly or through another water" to a traditional navigable water, interstate water, or territorial sea, and (2) "is characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark." 40 C.F.R. § 230.3(o)(3)(iii). Tributaries are jurisdictional even where man-made or natural breaks occur, "so long as a bed and banks and an ordinary high water mark can be identified upstream of the break." *Id.* "Ordinary high water mark" is defined broadly as "that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means." *Id.* § 230.3(o)(3)(vi). The Corps has acknowledged in a guidance document that it is common for "problematic situations" to arise, making the ordinary high water mark "difficult to interpret." *See* U.S. Army Corps of Engineers, *A Guide to Ordinary High Water Mark (OHWM) Delineation for Non-Perennial Streams in the Western Mountains, Valleys, and Coast Region of the United States* (Aug. 2014).  This is particularly true in Florida "where the banks are low and flat, the water does not impress on the

23

soil any well-defined marks of demarcation between the bed and the banks." *Tilden v. Smith*, 94 Fla. 502, 513 (Fla. 1927). But now, contrary to Corps guidance, the difficult job of determining the ordinary high water mark may be "infer[red]" through desktop computer models and without "a field visit."  80 Fed. Reg. at 37,077.

e.  "Adjacent" waters are waters "bordering, contiguous, or neighboring" a traditional navigable water, interstate water, territorial sea, impoundments of these waters, or a jurisdictional tributary.   40 C.F.R. § 230.3(o)(3)(i). "Neighboring" waters are defined as waters, any part of which, are located (1) within 100 feet of the ordinary high water mark of any jurisdictional waters, (2) within the 100-year floodplain of any jurisdictional waters but not more than 1,500 feet from the ordinary high water mark of such waters, or (3) within 1,500 feet of the high tide line of a traditional navigable water, interstate water, territorial sea, or within 1,500 feet of the ordinary high water mark of the Great Lakes.  *Id.* § 230.3(o)(3)(ii)(A)-(C).

57.  *Case-Specific Significant Nexus Evaluation* – Waters that are not categorially jurisdictional might still be jurisdictional based on a case-specific "significant nexus" evaluation.  A water with a "significant nexus" is "a water, including wetlands, [that] either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, or

24

biological integrity" of a traditional navigable water, interstate water, or territorial sea. *Id.* § 230.3(o)(3)(v). "Waters are similarly situated when they function alike and are sufficiently close to function together in affecting downstream waters." *Id.* The following are automatically considered to be "similarly situated" and thus jurisdictional: (1) prairie potholes, Carolina and Delmarva bays, pocosins, western vernal pools in California, and Texas coastal prairie wetlands," *id.* § 230.3(o)(1)(vii); (2) any water within the 100-year floodplain of an otherwise jurisdictional water, § 230.3(o)(1)(viii); (3) waters, any part of which are 4,000 feet of the high tide line or ordinary high water mark of any otherwise jurisdictional water, impoundment of an otherwise jurisdictional water, or jurisdictional tributary, *id.*

58. *Excluded Waters* – Waters excluded from jurisdiction include, among other things, "waste treatment systems"; a small subset of ditches that do not contribute flow to a jurisdictional water; ditches with ephemeral or intermittent flow that do not drain wetlands, relocate tributaries, or excavate tributaries; "stormwater control features" created in "dry land"; and puddles. *Id.* § 230.3(o)(2). But the exclusions are vague. For example, there is no definition of "dry land," and the specific mention of "stormwater control features" suggests that such features do not fall within the "wastewater treatment systems" exclusion – the latter not being limited to those constructed in "dry land." *Id.*

*Problems with the Final Rule*

59.    The Rule violates the U.S. Constitution, the Clean Water Act, the Anti-Lobbying Act, the Regulatory Flexibility Act, and the APA.

60.    The Rule codifies an interpretation of the phrase "waters of the United States" that exceeds Congress's powers under the Commerce Clause.   More specifically, as the U.S. Supreme Court explained in *SWANCC*, in enacting the Clean Water Act, Congress intended for jurisdiction to be tied to its commerce power over navigation – to its ability to regulate channels of interstate commerce like navigable rivers, lakes, and canals.   531 U.S. at 168 n.3.   By extending jurisdiction to isolated wetlands, ponds, ditches, stormwater conveyances and canals that have no navigable features – and lack meaningful connections to navigable waters – the Rule violates the Commerce Clause.   *Cf. Rapanos,* 547 U.S. at 731, 779 (four-member plurality and Justice Kennedy agreeing that the word "navigable" should have some significance); *SWANCC,* 531 U.S. at 172 (explaining that "navigable" has "at least the import of showing us what Congress had in mind as its authority for enacting the [Act]:  its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made").

61.    The Rule misinterprets *Rapanos* by codifying Justice Kennedy's wetland-specific "significant nexus" test for all waters.  In *Rapanos*, both the four-

member plurality and Justice Kennedy agreed that non-navigable tributaries of jurisdictional waters should not be *per se* jurisdictional.  Justice Kennedy said that "mere adjacency to a tributary" is insufficient, 547 U.S. at 786, and warned against the regulation of "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water-volumes toward it," *id.* at 781.  The plurality similarly warned against extending jurisdiction to "'ephemeral streams,' 'wet meadows,' storm sewers and culverts, 'directional sheet flow during storm events,' drain tiles, man-made drainage ditches, and dry arroyos in the middle of the desert." *Id.* at 734.

62.    For wetlands, both the four-member plurality and Justice Kennedy agreed that hydrological connections alone would not be enough for a wetland to become jurisdictional.  *Id.* at 732, 784.  The plurality and Justice Kennedy did disagree about the precise test for wetlands.  The plurality found that wetlands would be jurisdictional where there exists "a continuous surface connection" to jurisdictional waters.  *Id.* at 742.  Justice Kennedy would require a "significant nexus" between wetlands and jurisdictional water – a showing that the wetlands "significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780.

63.    As such, EPA and the Corps misinterpret *Rapanos* in at least three important respects:  (1) they apply Justice Kennedy's "significant nexus" test to

27

waters other than wetlands; (2) wrongly assume that Justice Kennedy's test alone controls even though "*the* holding" in *Rapanos* – "*the* narrowest" grounds for the Court's decision would require wetlands to pass both the plurality and Kennedy tests, *Marks v. United States,* 430 U.S. 188, 193 (1977)(emphasis added); and (3) ignore that Justice Kennedy's test calls for a flexible, site-specific inquiry into the "nexus" between specific wetlands and navigable waters.

64.     The Rule violates the Due Process Clause because it fails to give people of ordinary intelligence notice of what the law is and what it requires of them.   More specifically, the Rule's definitions of tributaries, adjacency, significant nexus, excluded ditches, excluded water management features, excluded stormwater conveyances, and dry land are unconstitutionally vague.   The definition of "significant nexus," for example, uses words and phrases like "integrity," "significant effect," "insubstantial," "similarly situated waters" and "the functions the evaluated waters perform."   No reasonable person – including the Plaintiffs and their members – can plan their operations based on such phrases. Such phrases open the door to arbitrary enforcement, and invite citizen suits to test the (jurisdictional) waters.

65.     The process used to promulgate the Rule violates the Due Process Clause because EPA and the Corps failed to consider public comments with an open mind.   Abdicating their role as impartial regulators, EPA and the Corps

28

instead used a campaign designed to shape public opinion. This made clear that EPA and the Corps had no intention to listen to those who spoke against the proposed Rule. This public relations blitzkrieg by EPA and the Corps also violated the Anti-Lobbying Act, 18 U.S.C. § 1913.

66.   EPA and the Corps subverted the notice-and-comment process by failing to make the Connectivity Report available for public comment; making significant revisions to the Rule that were not a logical outgrowth of its proposal; and providing a misleading economic analysis in contravention of the Regulatory Flexibility Act, 5 U.S.C. §§ 601-12.

67.   The limitation of the exclusion for stormwater conveyances to those "created in dry land" is inconsistent with the Clean Water Act's plain text. The Act requires permits only for "discharges *from* municipal storm sewers." 33 U.S.C. § 1342(p)(3)(B)(emphasis added). But by limiting the stormwater conveyance exclusion to only those "features . . . created in dry land," the Rule carves up the stormwater exclusion. And, for the first time, the Rule requires permits for discharges *into* municipal storm sewers – *into* features that form the municipal storm sewer with permitted downstream outfalls. This uroboros feature violates the Clean Water Act's plain language. *Id.*; *see also* 40 C.F.R. § 122.26(b)(9)(defining an MS4's "outfall" as "the point where a municipal separate storm sewer discharges to waters of the United States").

29

68.     Requiring permits for discharges into stormwater conveyances – or for maintenance work in stormwater conveyances – would divert scarce resources away from projects that would actually benefit the environment.  This would be in contravention of the Clean Water Act's "national policy . . . to prevent needless duplication and unnecessary delays at all levels of government."   33 U.S.C. 1251(f).

69.     Several Rule provisions are inconsistent with scientific evidence that was before EPA and the Corps.  The definitions of "significant nexus" and "adjacent," for example, are based on a connectivity concept.  The scientific evidence shows that connectivity is a site-specific concept, based on site-specific factors.  EPA and the Corps, however, have drawn bright lines like the 100-year floodplain boundary without regard for site-specific factors like soil type and conditions, slope, frequency of rainfall, duration of rainfall, magnitude of rainfall, frequency of flow, and distance to navigable waters.

COUNT I:  VIOLATION OF 5 U.S.C. § 706(2)(A)

70.     Plaintiffs incorporate by reference all preceding paragraphs.

71.     The Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of 5 U.S.C. § 706(2)(A).  Among other things, the Rule is unsupported by the law, scientific and economic evidence before EPA and the Corps, and inconsistent with Clean Water Act's text.

30

COUNT II:  VIOLATION OF 5 U.S.C. § 706(2)(B)

72.    Plaintiffs incorporate by reference all preceding paragraphs.

73.    The Rule is "contrary to constitutional right, power, privilege, or immunity" in violation of 5 U.S.C. § 706(2)(B).  Among other things, the Rule exceeds federal authority under Section 8 of Article 1 of the U.S. Constitution – the Commerce Clause – and violates the rights guaranteed by the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

COUNT III:  VIOLATION OF 5 U.S.C. § 706(2)(C)

74.    Plaintiffs incorporate by reference all preceding paragraphs.

75.    The Rule was promulgated "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" in violation of 5 U.S.C. § 706(2)(C).  Among other things, the Rule definition of "waters of the United States" is inconsistent with the Clean Water Act's text, and in excess of the authority conferred on EPA and the Corps by the Act.

COUNT IV:  VIOLATION OF 5 U.S.C. § 706(2)(D)

76.    Plaintiffs incorporate by reference all preceding paragraphs.

77.    The Rule was promulgated "without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(D).  Among other things, EPA and the Corps failed to disclose final versions of seminal supporting documents, analyses, and evidence during the notice-and-comment process in violation of 5 U.S.C. §

31

553; made substantial changes to the Rule between publication of the proposed Rule and final Rule without reopening the comment period; neglected to undertake a regulatory flexibility analysis as required by the Regulatory Flexibility Act, 5 U.S.C. § 601-02; and undertook a public advocacy process that undermined the integrity of the notice-and-comment requirement and violated the Anti-Lobbying Act, 18 U.S.C. § 1913.

PRAYER FOR RELIEF

WHEREFORE Plaintiffs ask that the Court:

A.    Declare that the process used to promulgate the Rule violates the APA;

B.    Declare that the Rule itself violates the APA;

C.    Declare that the Rule is inconsistent with the Clean Water Act's text;

D.    Declare that EPA and the Corps violated the Regulatory Flexibility Act in promulgating the Rule;

E.    Declare that EPA and the Corps violated the Anti-Lobbying Act in promulgating the Rule;

F.    Declare that the Rule exceeds federal authority under Section 8 of Article 1 of the U.S. Constitution – the Commerce Clause;

G.    Declare that EPA and the Corps violated the Due Process Clause of the Fifth Amendment to the U.S. Constitution in promulgating the Rule;

H.     Declare that the Rule itself violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution;

I.     Enter an order vacating the Rule;

J.     Enter an order enjoining EPA or the Corps from implementing the Rule;

K.     Award Plaintiffs their reasonable fees, costs and expenses, and attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

L.     Grant any other relief the Court deems just and proper.

Respectfully submitted,

*/s/     Mohammad O. Jazil*
Mohammad O. Jazil, Florida Bar No. 72556
mohammadj@hgslaw.com
David W. Childs, Florida Bar No. 13354
davidc@hgslaw.com
Adam F. Blalock, Florida Bar No. 16397
adamb@hgslaw.com
HOPPING GREEN & SAMS, P.A.
119 South Monroe Street, Suite 300 (32301)
P.O. Box 6526 Tallahassee, FL 32314
Telephone: (850) 222-7500
Facsimile: (850) 224-8551

Dated:  November 30, 2015          *Counsel for Plaintiffs*